[No. B225646. Second Dist., Div. Six. Mar. 30, 2011.]

MARIANNE MONTY et al., Plaintiffs and Appellants, v. GEORGE S. LEIS et al., Defendants and Respondents.

■

**COUNSEL**

Johnson Bottini, Frank J. Johnson, Francis A Bottini, Jr., and Brett M. Weaver for Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, Daniel J. Tyukody, Michael C. Tu, Jason L. Krajcer; Reicker, Pfau, Pyle & McRoy and Diana Jessup Lee for Defendants and Respondents.

**OPINION**

**GILBERT, P. J.**—Corporate shareholders approve an amendment to a corporation's articles to increase the number of authorized shares. Thereafter the corporation enters into an investment agreement that gives an investor shares of common and preferred stock. The agreement provides that the preferred stock would convert to many more additional shares of common stock. Issuance of these additional shares would require an amendment to the articles.

■ May the investor use its majority shares after the agreement is signed to amend the articles to allow it to issue to itself these additional shares? We conclude that it may.

Two shareholders in a failing bank sought a preliminary injunction to prevent an investment agreement from closing. The agreement would add $500 million to the bank's capital. The trial court denied the preliminary injunction. While the matter was on appeal, the transaction closed, rendering the petition for injunction moot. Nevertheless, the shareholders claim the questions raised are still at issue between the parties. We examine the issues raised by the shareholders and conclude they have no merit. We affirm.

FACTS

Pacific Capital Bancorp is the parent company of Pacific Capital Bank, a regional bank headquartered in Santa Barbara. George S. Leis is a member of

the bank's board of directors. (Pacific Capital Bancorp and its directors are collectively PCB herein except where the context indicates otherwise.) Marianne Monty and James Clem (collectively Monty) are shareholders of PCB. PCB shares are traded on the NASDAQ exchange.

PCB suffered losses in the real estate loan market that resulted in a write-down of the value of its assets and lowered earnings. The Office of the Comptroller of the Currency (OCC) and the Federal Reserve Bank (FRB) imposed a number of conditions on PCB. One condition was that PCB must significantly improve its capital position no later than September 8, 2010. Failure to meet the condition would place PCB at risk of being seized by federal regulators and liquidated.

In August 2009, PCB issued a proxy statement for a proposal to amend its articles of incorporation. The proposal was to increase its authorized common stock from 100 million to 500 million shares. The shareholders approved the share increase in September 2009.

On April 29, 2010, PCB entered into an investment agreement with Ford Financial Fund, LP (Ford). The agreement required Ford to provide $500 million in new capital to PCB. Upon closing the transaction, Ford would receive 225 million shares of common stock and 455,000 shares of convert-. ible preferred stock. The issuance of both the common and preferred stock were well within the 500 million shares of common stock and the one million shares of preferred stock authorized by PCB's articles at the time the investment agreement was made. Thus issuance of the stock would not require an amendment of PCB's articles.

PCB's articles authorize "blank check" preferred stock. This authorizes the board to subject the stock to any rights and conditions the board may deem proper. Pursuant to the investment agreement, the 455,000 shares of preferred stock issued to Ford would convert to 2.275 billion shares of common stock. Ford would own between 80 and 91 percent of PCB's stock, depending on how many existing shareholders exercised the right to purchase common stock. The issuance of 2.275 billion shares of common stock would require an amendment of the articles of incorporation.

A condition of the investment agreement was that PCB reach an agreement with the United States Department of the Treasury, which held shares of PCB preferred stock. The agreement was not reached until July 26, 2010.

Because PCB was facing a September 8, 2010 deadline, it decided to proceed without a vote of the then current shareholders. Ordinarily NASDAQ rules would require a vote for such a transaction. PCB obtained an exemption

from NASDAQ on the ground that the potential delay in obtaining shareholder approval would threaten the financial viability of the company.

PCB's plan was to issue the 225 million shares of common stock to Ford on the closing date. Those shares had been previously authorized by the shareholders. The 225 million shares would give Ford a majority of PCB's stock. Only a simple majority is necessary to amend the articles. After obtaining the 225 million shares, Ford alone would vote immediately to amend the articles to authorize the issuance of 2.275 billion shares of common stock required by the investment agreement. Thus the transaction could be completed without the vote of any shareholders other than Ford.

Before the transaction closed, Monty brought the instant action against PCB and its board of directors. The complaint alleged both direct and derivative causes of action. On June 10, 2010, Monty filed a motion for a preliminary injunction seeking to enjoin the proposed investment transaction or to unwind the transaction if it closes.

Monty made the motion on the ground that the proposed transaction violates Corporations Code section 405, subdivision (a). Specifically, Monty claimed that the investment agreement requires more shares than are authorized by the articles, and that the defect cannot be cured by Ford's vote alone.

After a hearing, the trial court denied the petition for the preliminary injunction without prejudice. The court found that Monty had failed to show that the balance of harms favored plaintiffs or that plaintiffs were likely to succeed on the merits.

## DISCUSSION

### I

PCB contends the appeal is moot because the investment transaction closed on August 31, 2010.[1]

Monty does not deny the transaction has closed. Instead she argues the appeal is not moot because enjoining the transaction was not the only relief she sought. Her petition also requested that the trial court order the transaction rescinded if it had closed.

■ But where a merger or acquisition takes place after the trial court has refused to issue a preliminary injunction, courts have refused to set aside the

---

[1] PCB's requests for judicial notice dated August 27 and October 20, 2010, are granted.

transaction. (See *Bank of New York Co., Inc. v. Northeast Bancorp, Inc.* (2d Cir. 1993) 9 F.3d 1065, 1066–1067; *F.T.C. v. Exxon Corp.* (D.C. Cir. 1980) 205 U.S. App.D.C. 208 [636 F.2d 1336, 1342–1343].) As the court in *F.T.C.* stated: "Mergers and acquisitions are often followed by a commingling of assets and other substantial changes in the structures of the enterprises involved. Once those changes occur, it is often impossible . . . to compel a return to the status quo, and the legality of the challenged merger or acquisition may become essentially a moot question." (*F.T.C.*, 636 F.2d at p. 1342.)

Monty cites no case in which the court has set aside a completed merger or acquisition.

Here setting aside the transaction would require at a minimum the return to Ford of $500 million plus interest. There is no reasonable likelihood that can be done. Moreover, the loss of so much capital would undoubtedly cause federal regulators to seize the bank and liquidate its assets. The result would be the loss of any value the shareholders have left. There is no reasonable probability that any court would order the transaction set aside.

Monty urges that we consider the matter nevertheless, because the questions presented here remain at issue between the parties. She points out that the issues are fully briefed, and that it makes no sense to return the matter to the trial court only to have the issues raised on appeal again. We will discuss the issues in the interest of judicial economy.

II

Monty contends the investment agreement violates Corporations Code section 405, subdivision (a).[2] She claims the investment agreement requires PCB to issue more shares than are authorized by its articles.

Section 405, subdivision (a) states: "If at the time of granting option or conversion rights or at any later time the corporation is not authorized by its articles to issue all the shares required for the satisfaction of the rights, if and when exercised, the additional number of shares required to be issued upon the exercise of such option or conversion rights shall be authorized by an amendment to the articles."

Monty's argument is that section 405, subdivision (a) requires the shareholders to vote to amend the articles at the time the investment agreement is made. But that is not what the subdivision says. The subdivision recognizes that there may be a lapse of time between the granting of the option or

---

[2] All statutory references are to the Corporations Code.

conversion rights and the exercise of the rights. It clearly does not require that the articles be amended at the time of the granting of the option or conversion rights. It states, "If at the time of granting option or conversion rights *or at any later time* . . . ." (*Ibid.*, italics added.) Nothing in section 405, subdivision (a) requires an amendment of the articles at the time the option or conversion rights are granted.

Monty argues the phrase "or at any later time" contemplates a situation where a corporation has sufficient shares at the time the option or conversion rights are granted, but subsequently fails to have enough authorized shares to satisfy the option or conversion rights. Certainly that is one situation where the phrase "or at any later time" applies. But nothing in section 405 limits its application to that situation.

█ Section 405, subdivision (a) says nothing more than that if at any time the authorized shares are not sufficient to satisfy option or conversion rights, the shares required to be issued on exercise of the rights shall be authorized by amendment to the articles. That is what happened here. Upon closing of the investment agreement, the authorized shares were insufficient to satisfy Ford's conversion rights. Ford as majority shareholder amended the articles to authorize sufficient shares to satisfy its rights.

The crucial event here was not Ford's vote to increase the number of authorized shares. Instead, the crucial event occurred in September 2009 when the shareholders approved an amendment to the articles increasing the number of authorized shares from 100 million to 500 million. That ensured an investor could obtain a majority of the shares. Once Ford obtained a majority of the shares, it could amend the articles to authorize as many shares as required under the agreement.

### III

Monty contends the investment agreement violates section 1001.

█ Section 1001, subdivision (a) requires a vote of the outstanding shares of the sale or transfer of substantially all of a corporation's assets. Monty argues the sale of 91 percent of the bank's stock comes within its provisions. The only authority Monty cites in support of her argument is *Solorza v. Park Water Co.* (1948) 86 Cal.App.2d 653 [195 P.2d 523]. But *Solorza* involved the sale of tangible assets, not stock. Monty cites no authority that the sale of stock is governed by section 1001.

In any event, section 1001, subdivision (a) allows approval by the shareholders "either before or after approval by the board and before or after the transaction." Thus even if section 1001 applies, Ford can by itself approve the transfer after the sale.

## IV

Finally, Monty contends the investment agreement contains an improper defensive mechanism.

Monty argues that PCB's board breached its fiduciary duty by failing to include a provision allowing PCB to back out of the deal if a better offer is made. She cites Delaware Supreme Court case *Omnicare, Inc. v. NCS Healthcare, Inc.* (Del. 2003) 818 A.2d 914, for the proposition that an investment agreement must contain such a way out.

But *Omnicare* has been criticized even by Delaware courts. (See *In re Toys "R" Us, Inc., Shareholder Litigation* (Del.Ch. 2005) 877 A.2d 975, 1016, fn. 68 [*Omnicare* "represents . . . an aberrational departure from [the] long accepted principle" that what matters is whether the board acted reasonably in light of all the circumstances].)

■ We decline to follow *Omnicare*. The better authority is *Jewel Companies, Inc. v. Pay Less Drug Stores Northwest, Inc.* (9th Cir. 1984) 741 F.2d 1555, a case decided under California law. In *Jewel*, the court held that a board of directors may lawfully bind itself in a merger agreement to forbear from negotiating or accepting competing offers. (*Id.* at p. 1564.) The court reasoned: "An exclusive board-negotiated merger agreement may confer considerable benefits upon the shareholders of a firm. A potential merger partner may be reluctant to agree to a merger unless it is confident that its offer will not be used by the board simply to trigger an auction for the firm's assets. Therefore, an exclusive merger agreement may be necessary to secure the best offer for the shareholders of a firm. . . . [¶] It is true that in certain situations the shareholders may suffer a lost opportunity as a result of the board's entering into an exclusive merger agreement. ■ As the district court took great pains to point out, subsequent to a contractual commitment unanticipated business opportunities and exigencies of the marketplace may render a proposed merger less desirable than when originally bargained for. But all contracts are formed at a single point in time and are based on the information available at that moment. The pursuit of competitive advantage has never been recognized at law as a sufficient reason to render void, or voidable, an otherwise valid contract, and in our view, it was not the intention of the drafters of California's Corporate Code to make this any less true of negotiated merger agreements." (*Jewel Companies, Inc. v. Pay Less Drug Stores Northwest, Inc., supra,* 741 F.2d at pp. 1563–1564.)

The same reasoning applies to the investment agreement. The board had no duty to include a "fiduciary out" in the agreement.

The judgment is affirmed. Costs on appeal are awarded to respondents.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied April 27, 2011, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 15, 2011, S192948.