Filed 3/20/26  P. v. Pusok CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084050 |
| v. | (Super. Ct. No. FVI23003014) |
| FRANCIS JARED PUSOK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Debra Harris, Judge. Reversed in part, affirmed in part with directions.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant and appellant Francis Pusok violently assaulted a gas station clerk after the clerk told him to stop harassing two women.  Defendant then led a responding sheriff's deputy on a high-speed car chase.  During that chase, defendant drove in the wrong lane and nearly crashed headfirst into another responding deputy's car driving in the opposite direction.  The chase ended with Pusok crashing.  When being transported by an ambulance, Pusok kicked one of the responding deputies in the knee.

A jury convicted defendant of (1) battery (Pen. Code, § 243, subd. (d); count 1),[1] (2) assault with a deadly weapon on a peace officer (§ 245, subd. (c); count 2), (3) possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), (4) evading an officer against traffic (Veh. Code § 2800.4; count 4), and (5) assault by means of force likely to produce great bodily injury (GBI) (§ 245, subd. (a)(4); count 5).  As to count 5, the jury also found true the allegation that defendant personally inflicted GBI (§ 12022.7, subd. (a)).  The trial court found that defendant had two prior serious-felony strike convictions and sentenced him to five years, four months, plus 60 years to life.

_____

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

Defendant contends (1) the trial court gave the jury an erroneous definition of GBI and the prosecutor erroneously defined GBI in closing argument, (2) the trial court improperly precluded defendant from cross-examining two sheriff's deputies about a 2015 incident involving defendant and sheriff's deputies and, in turn, improperly denied his motion for a new trial based on that ruling, (3) the trial court erroneously declined to strike one or more of his prior convictions, (4) his sentence is cruel and unusual, and (5) the abstract of judgment does not accurately reflect the oral pronouncement of judgment. Defendant also asks that we independently review police personnel records (see *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)).

As we explain below, we conclude the trial court and the prosecutor both used a correct definition of GBI. We conclude, however, that the trial court prejudicially violated the Confrontation Clause (U.S. const., amend. VI) by overly restricting defendant's cross-examination of two sheriff's deputies, whose testimony was the only prosecution evidence presented on counts 2 and 4. We therefore reverse defendant's convictions on those counts and remand for further proceedings, which moots defendant's claims of sentencing errors. And although our reversal on counts 2 and 4 likewise moots defendant's *Pitchess* request, we exercise our discretion to address the issue and find that the trial court should have ordered the production of two civilian complaints. Given this disposition, we need not address defendant's claim that the abstract of judgment is incorrect, since the trial court must enter a new judgment on remand.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 1:00 a.m., defendant approached two women sitting in a car at a gas pump and asked them if they wanted to buy a phone, AirPods, or alcohol. After the women said no, defendant threw the AirPods on the hood of the car, shoved the phone through a crack in the car's window, and then climbed on the hood of the car.

The gas station clerk came outside and asked the women if they knew defendant or if he was bothering them. The women said they did not know him, so the clerk asked him to leave. Defendant and the clerk began yelling at each other, so the clerk said he was going to call the police and turned to go back inside.

Defendant then ran at the clerk, jumped on him, and knocked him down. Defendant then straddled the clerk and punched him in the face about 15 times. The clerk was eventually able to run inside and close the door behind him, but defendant ran to the double doors and began pulling on them as the clerk held them shut. Defendant then ran to his car and drove off, and the clerk called 911.

After a San Bernardino County sheriff's deputy responded to the scene, defendant returned. Defendant drove past the deputy, did a U-turn, and sped off. The deputy turned on his lights and pursued defendant.

Defendant then led the deputy on a high-speed chase during which defendant exceeded the speed limit, drove through stop signs, drove in the wrong lane, turned off his headlights, and drove across multiple lanes of traffic.

4

At one point, a second San Bernardino County sheriff's deputy with lights activated drove toward defendant from the opposite direction. Defendant was driving toward the deputy in the wrong lane. As they approached each other, defendant did not move over to the correct lane, which forced the deputy to move after nearly colliding into defendant.

Later, defendant briefly stopped at an intersection, so the two deputies stopped and waited for him. Defendant then accelerated at the deputies. They moved out of the way and resumed chasing defendant. Defendant eventually lost control of his car, crashed, and his car rolled over to a stop.

The deputies arrested defendant and found a gun underneath his car. They summoned medical care for defendant, and one of the deputies rode in the ambulance with defendant to the hospital. During that ride, defendant became violent and kicked the deputy in the knee.

III.

DISCUSSION

Defendant contends (1) the trial court gave the jury an erroneous definition of GBI and the prosecutor erroneously defined GBI in closing argument, (2) the trial court improperly precluded defendant from cross-examining two sheriff's deputies about a 2015 incident involving defendant and sheriff's deputies and, in turn, improperly denied his motion for a new trial based on that ruling, (3) the trial court erroneously declined to strike one or more of his prior convictions, (4) his sentence is cruel and unusual, and (5)

5

the abstract of judgment does not accurately reflect the oral pronouncement of judgment. Defendant also asks that we independently review police personnel records (see *Pitches*, *supra*, 11 Cal.3d 531).

As we explain below, we conclude the trial court and the prosecutor both used a correct definition of GBI. We conclude, however, that the trial court prejudicially violated the Confrontation Clause by overly restricting defendant's cross-examination of two sheriff's deputies, whose testimony was the only prosecution evidence presented on counts 2 and 4. We therefore reverse defendant's convictions on those counts and remand for further proceedings, which moots defendant's claims of sentencing errors. And although our reversal on counts 2 and 4 likewise moots defendant's *Pitchess* request, we exercise our discretion to address the issue and find no error. Given this disposition, we need not address defendant's claim that the abstract of judgment is incorrect, since the trial court must enter a new judgment on remand.

A. *Instructional Error*

The trial court instructed the jury with CALCRIM Nos. 80 and 875, which explained that GBI "means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

The prosecutor argued during closing argument: "Great bodily injury means that there is a significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] Not to be repetit[ous] here, however, [the clerk] again testifies that he separated or dislocated his shoulder, which he had to reset. He has

6

memory loss issues. And he's got significant bruising. All that qualifies. Therefore, the special allegation for great bodily injury is true. [¶] Therefore, based on [c]ount 5 the defendant is guilty of assault with force likely to cause great bodily injury and the associated great bodily injury itself."

"A claim of instructional error is reviewed de novo . . . . In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Defendant contends the instruction improperly allowed the jury to find that GBI is an injury that is greater than minor *but not* greater than moderate. Like several other courts, we reject this argument. (*People v. Caparrotta* (2024) 103 Cal.App.5th 874, 881, 902-904; *People v. Sandoval* (2020) 50 Cal.App.5th 357, 360-362; *People v. Quinonez* (2020) 46 Cal.App.5th 457, 461-466.) For the reasons outlined in these opinions, the definition of GBI the trial court here used was correct and clear. "'Injury that is greater than minor or moderate harm' cannot reasonably be read to mean injury that is more than minor but less than moderate. Such an interpretation simply does not make sense, legally or grammatically, particularly when the phrase is preceded by the explanation that great bodily injury means physical injury that is 'significant or substantial.'" (*People v.*

7

*Sandoval*, *supra*, at p. 361.)  We thus conclude the trial court properly instructed the jury. And because the prosecutor used the same proper definition of GBI in closing, the prosecutor did not misstate the law.

      B. *Evidence of 2015 Incident*

        1. *Background*

In 2015, San Bernardino County sheriff's deputies arrested defendant for reportedly stealing a horse.  The incident was captured by a media helicopter and captured several deputies apparently punching and kicking defendant while he appeared to be surrendering.  Three of the deputies involved in the arrest were charged with felony charges for assaulting defendant.  After the jury deadlocked on those charges, they were dismissed as part of a plea deal.  The deputies then pled no contest to misdemeanor charges of disturbing the peace.  Defendant received a $650,000 settlement from San Bernardino County for the incident.

The only two witnesses for count 2 (assault on a police officer) and count 4 (evading an officer against traffic) were San Bernardino County Sheriff's Deputies G. Dominguez and J. Kabluyen.  Defendant thus sought to introduce evidence of the 2015 incident to show that the deputies were biased against him and thus undermine their credibility.

During voir dire, however, the trial court precluded the parties from asking prospective jurors about the 2015 incident.  Instead, they could ask only if anyone was familiar with defendant.

At several points during the trial, the trial court precluded defendant from asking about the deputies' knowledge of defendant. One of the women from the gas station, Jeanene Snyder, testified on direct that a deputy brought her to where defendant crashed his vehicle and provided her statement there. On cross-examination, defense counsel asked, "And isn't it true that you asked the deputies if you could take photographs of the crash?" The prosecutor objected, and the court held a sidebar. Defense counsel explained the question was relevant to establish the deputies' bias because an unidentified deputy told Snyder that she could not take a picture of the crash, but told her who defendant was and that she could "Google him to watch the video."[2] The trial court then sustained the prosecutor's objection, ruling that defense counsel had to first ask the deputy about his statement.

During Deputy Dominguez's cross-examination, he stated that he was "familiar with who [defendant] is generally," and that he knew of a "prior incident between [defendant] and the sheriff's department in 2015." The prosecutor objected, and the court held a sidebar. After defense counsel explained the questioning was to probe Deputy Dominguez's "bias, motive to lie," the trial court ruled that defense counsel could ask "'Do you have a bias,'" reasoning that "anything else is not relevant because he said, 'I know of him.'" Defense counsel said he would ask that question, and the trial court reiterated: "So just ask him, 'Based on your knowledge of who [defendant] was, do you have a bias in your testimony?'" Defense counsel accordingly asked that question, and

---

[2] The record is unclear as to which deputy told this to Snyder.

9

Dominguez replied, "No." Defense counsel then asked, "[B]ased on your knowledge of who [defendant] is, do you have a motive to lie?" Dominguez replied, "No."

The trial court later revisited its ruling on its own. The court explained: "If defense got permission to bring up that bias when the officers said, no, I'm not bias[ed], there's nothing to be gained than opening the door for the People to use that information for motive. Specifically motive, why would a person drive a car directly into another oncoming vehicle? Why would an individual want to be armed? Because that's an allegation. The firearm was there for him to use it." The court noted that a jury instruction explained that motive was not required, but could be used if the jury found one. But to "keep everything clean," the court again found that evidence of the 2015 incident was "not relevant." Defense counsel confirmed whether this ruling applied to both deputies, and the court confirmed that it did. The court explained that defense counsel could ask, "[D]id you know of him, or, if you had prior knowledge, that prior knowledge, did it cause you to have any knowledge into whatever."

Later, when cross-examining Deputy Kabluyen, defendant asked, "are you generally familiar with [defendant]?" Deputy Kabluyen responded that he was "familiar with who he is" and had "heard the name" before "this incident." Defendant then asked, "[D]o you have a motive or bias against [defendant] that would cause you to lie about him?" The deputy said that he did not.

The trial court's ruling limiting cross-examination of the deputies was one of several grounds for defendant's motion for new trial after his conviction. Defendant

10

argued the ruling improperly precluded him from cross-examining the deputies about their bias against him. Defendant argued the deputies had significantly different versions of the pursuit and arrest of defendant, and Deputy Kabluyen's trial testimony differed from his preliminary hearing testimony. Defendant thus argued that, by excluding evidence of the 2015 incident, he was prevented from effectively presenting "an essential part" of his defense, which was that the deputies "were lying about him because of his past."

Defendant noted there was evidence showing that the deputies knew who he was. "First, a deputy rewarded Ms. Snyder for giving a statement by telling her who [defendant] was. The deputy wanted to 'give [her] one thing for [her] efforts,' told her [defendant's] name, to [G]oogle him, and to watch the video of [defendant] being beaten by San Bernardino County [s]heriff's deputies in 2015. Second, Deputy Kabluyen on his audio can be heard talking to another individual, presumably law enforcement associated with the San Bernardino County Sheriff's Department, about [defendant] declining medical treatment but then needing to be taken back. The other person said, 'so when he does it again,' which can reasonably be associated with suing the department, and Deputy Kabluyen says, 'I said the same thing.'"

At the hearing on the motion, defense counsel emphasized that evidence of the 2015 incident was relevant to prove that the deputies were biased against defendant and that it should have been admitted to allow the jury to assess their credibility. The trial

court denied the motion, finding that defendant had a sufficient opportunity to attack the deputies' credibility by asking them if they knew defendant and were biased against him.

2. *Applicable Law and Standard of Review*

Defendants have a Sixth Amendment right to cross-examine witnesses. (*People v. Royal* (2019) 43 Cal.App.5th 121, 149.) But they have a right only to "reasonable cross-examination." (*Olden v. Kentucky* (1988) 488 U.S. 227, 231.) Trial courts therefore have "wide discretion in determining the appropriate scope of cross-examination." (*People v. Royal*, *supra*, at p. 149; *People v. Gonzalez* (2021) 12 Cal.5th 367, 406.)

Although trial courts may reasonably limit a defendant's cross-examination of a witness's bias, the Sixth Amendment's Confrontation Clause restricts the court's discretion. (*People v. Pearson* (2013) 56 Cal.4th 393, 455-456.) "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*).) Put another way, the trial court's restrictions on a defendant's cross-examination of a witness for bias does not violate the Sixth Amendment unless the defendant shows that "[a] reasonable jury might have received a significantly different impression" of the witness had the defendant been "permitted to pursue his proposed line of cross-examination." (*Ibid.*; accord, *People v. Quartermain* (1997) 16 Cal.4th 600, 623; see also *People v.*

*Castaneda-Price* (2023) 94 Cal.App.5th 1260, 1282 (*Castaneda-Price*).) However, excluding "evidence of marginal impeachment value" generally does not violate the Confrontation Clause. (*People v. Pearson*, *supra*, at p. 455.)

Thus, the threshold question is "whether the trial court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination" under "the deferential abuse of discretion standard of review governing such discretionary questions." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1282.) "If the trial court excluded 'evidence of marginal impeachment value' [citation], or otherwise merely carried out the routine evidentiary function of controlling the scope of permissible cross-examination, the answer to this initial evidence question will generally be yes—the trial court was within its discretion—and the inquiry comes to an end. There was no error, under either state law or under the Sixth Amendment." (*Ibid*.) But when a trial court "effectively renders cross-examination an exercise in futility, we must proceed to a second stage of analysis" and ask "whether '[a] reasonable jury *might have received* a significantly different impression' of the challenged witness's credibility if the proposed line of cross-examination had been permitted." (*Ibid*., italics added.)

We review the trial court's order restricting defendant's cross-examination of the deputies for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 765.) We likewise review the trial court's denial of defendant's motion for a new trial for an abuse of discretion. (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.)

13

3. *Analysis*

We first reject the People's argument, echoing the trial court, that any questioning of Deputies Dominguez and Kabluyen about the 2015 incident was improper because it could have opened the door for the prosecution to use the incident as evidence of defendant's motive. That tactical decision (which was defendant's to make) has no bearing on whether the trial court properly limited defendant's cross-examination of the deputies. The issue is whether defendant had a reasonable opportunity to cross-examine the deputies' potential bias, not whether that cross-examination might benefit the prosecution. (*Van Arsdall*, *supra*, 475 U.S. at pp. 678-679.)

We next address the People's contention that no Confrontation Clause violation occurred because defendant could have questioned the deputy who told Snyder to "Google" defendant "and watch the video" and could have questioned the person on the radio who "'said the same thing'" as Deputy Kabluyen and told him they were calling medical attention for defendant despite his denial "'so when he does it again.'"

That defendant could have asked other witnesses about the 2015 incident to attack the deputies' credibility is beside the point. Defendant had a Sixth Amendment right to reasonably probe the deputies' credibility by cross-examining *them*. (See *People v. Smith* (2007) 40 Cal.4th 483, 513 [Confrontation Clause allows "'appropriate cross-examination designed to show a prototypical form of bias on the part of the witness'"]; *People v. Quartermain*, *supra*, 16 Cal.4th at p. 623 ["[T]he right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility."].)

14

The issue here is, again, whether the trial court's limitation on defendant's cross-examination of Dominguez and Kabluyen violated the Confrontation Clause, not whether defendant had other available means to explore the deputies' bias beyond cross-examining them. The People offer no authority that suggests otherwise.

The People next argue no Confrontation Clause violation occurred because defendant did not "attempt to introduce affirmative evidence of his 2015 arrest" and so the trial court did not "exclude such evidence." The People further maintain that the trial court did not err because "neither of the deputies who testified at this trial appear to have been at [defendant's] 2015 arrest," so "what they heard is inadmissible hearsay."

To the extent the People argue that the trial court did not err because defendant did not introduce evidence of the 2015 arrest by other means, we disagree. Again, the issue is whether the trial court's limiting defendant's cross-examination of the deputies violated the Confrontation Clause.

We likewise disagree with the People's conclusory, wholly unsupported argument that the deputies could not have testified about anything to do with defendant's 2015 arrest since everything would have been inadmissible hearsay. We do not know what exactly the deputies knew about the incident, how they learned about it, and the extent to which their testimony about it would be admissible. On this record, it is entirely speculative that defendant could not establish that the deputies knew of the incident, the ensuing prosecution of the sheriff's deputies, and defendant's settlement without relying entirely on hearsay.

15

What Deputies Dominguez and Kabluyen knew about these things was not "of marginal impeachment value." The 2015 incident was so highly publicized that the trial court "doubt[ed] anybody in this county would not know" about it. The incident resulted in three sheriff's deputies—potentially former or current colleagues of Deputies Dominguez and Kabluyen—being criminally charged with felonies (but pleading to misdemeanors) for their conduct when arresting defendant. Defendant also received a $650,000 settlement from the county—the deputies' employer—because of the charged deputies' conduct.

The People argue the trial court properly precluded defendant from asking any questions about these events because the deputies' testified that they knew of defendant and were not biased against him. The People thus claim that exploring the deputies' specific knowledge of "an unrelated event . . . would not have established an additional basis for bias." We disagree. A reasonable jury, knowing that sheriff's deputies were prosecuted for assaulting defendant and that he received a large settlement for the incident, could reasonably find that Deputies Dominguez and Kabluyen had a negative opinion about defendant. That, in turn, could lead a reasonable jury to question the deputies' credibility. (See *Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1280 ["[F]acts showing bias are considered so highly probative of credibility . . . ."].) We thus agree with defendant that evidence of the deputies' knowledge of the 2015 incident, the ensuing prosecutions, and defendant's large settlement could have given the jury "a plausible

16

basis" to find that Deputies Dominguez and Kabluyen "harbored animosity or bias against" him, thereby undermining their credibility.

The testimony of Deputies Dominguez and Kabluyen was effectively the only evidence presented on the assault on an officer and felony evading charges (counts 2 & 4) since they were the only witnesses to those offenses.[3] Evidence about the deputies' knowledge of the 2015 incident was thus not of marginal impeachment value, nor was it "not relevant," as the trial court incorrectly concluded.[4] (See *United States v. Abel* (1984) 469 U.S. 45, 52 ["Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."].) This was the only evidence that showed the deputies might have been biased against defendant, despite their denials, and could have influenced the jury's view of their testimony. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1280 ["[B]ias has traditionally been viewed as especially powerful."].) Given that defendant's guilt on counts 2 and 4 hinged on the deputies' testimony, their credibility was a critical issue on those counts. (See *Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 52 ["Impeachment of a witness can make the difference between acquittal and conviction, especially where credibility is the major

---

[3] Defendant conceded he was guilty of misdemeanor evading.

[4] We note that the People do not argue that the trial court properly excluded the evidence under Evidence Code section 352.

17

issue in a case and evidence at trial will consist of opposing stories presented by the defense and the prosecution witnesses."].)

The trial court's ruling allowed defendant to ask the deputies only whether they knew defendant and whether they were biased against him. When both deputies said they were not biased against him, defendant could not then probe *any* potential bias stemming from the 2015 incident, even though the jury might have reasonably found that the incident gave the deputies a motive for favoring the prosecution. Defendant effectively had to accept the deputies' response at face value and move on with the cross-examination. In our view, the trial court's ruling made defendant's cross-examination of Deputies' Dominguez and Kabluyen "an exercise in futility." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1282; see also *Van Arsdall*, *supra*, 475 U.S. at 679 ["blanket" ruling "prohibit[ing] *all* inquiry into" a witness's potential bias violated Confrontation Clause].)

We therefore turn to the second step of the analysis, which asks "whether '[a] reasonable jury *might have* received a significantly different impression' of the challenged witness's credibility if the proposed line of cross-examination had been permitted." (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1282, italics added.) This requires us to focus "on the witness's cross-examination rather than the outcome of the trial as a whole, examining whether the defense had other means of impeachment" of the witness during cross-examination. (*Id*. at pp. 1282 & 1282, fn. 9.) We review the issue de novo. (*Ibid*.)

We conclude that a reasonable jury might have received a significantly different impression of the deputies' credibility had defendant been allowed to cross-examine them about their knowledge of the 2015 incident and its aftermath. In *Davis*, our Supreme Court held the trial court violated the Confrontation Clause by precluding the defendant from asking a prosecution witness any questions probing whether he was testifying for the prosecution, and thus biased in favor of the prosecution, to protect his probation status. (*Davis v. Alaska* (1974) 415 U.S. 308, 317-318.) The Court reasoned: "While counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness . . . ." (*Id*. at p. 318, italics added.)

So too here. Defendant was allowed to ask the deputies whether they knew defendant and whether they were biased against him, but he was not permitted to ask *any* further questions as to *why* they might be biased against him. Defendant thus was not "permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness[es]." (*Davi v. Alaska*, *supra*, 415 U.S. at p. 318.) Without any further context, this two-question line of inquiry could have left the jury thinking that defendant was baselessly attacking the deputies for being biased against him. Had defendant cross-examined the deputies about their knowledge of the

19

2015 incident, the resulting prosecution of three sheriff's deputies, and defendant's $650,000 settlement with the county, the jury *might have* received a significantly different impression of the deputies' credibility. By cutting off all questioning about an event that the jury might reasonably have made the deputies biased in the prosecution's favor, the trial court's ruling violated defendant's right to cross-examine.

Because we conclude the trial court's ruling violated defendant's Confrontation Clause right to cross-examine the deputies, we must reverse the convictions on counts 2 and 4 unless the People show the error was harmless beyond a reasonable doubt. (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)[5] The People have not done so.

The People offer two unpersuasive reasons why the error was harmless. First, they contend that the deputies' "[c]andid responses could have added to [their] credibility," and note that their previous knowledge of defendant and his involvement with the sheriff's department "may have explained a lack of aggressive tactics such as a PIT maneuver." But the People cite no evidence in the record showing that the deputies knew defendant was the driver before or during their pursuit of him. In any event, the fact that the deputies may have not used "aggressive tactics" during the pursuit because they knew of defendant does not dispel their potential bias stemming from the 2015 incident, which may have affected the credibility of their testimony. That is a credibility issue the jury should have decided.

---

[5] The People incorrectly argue we review the error under the less-stringent state law standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Second, the People reiterate their argument that the trial court's ruling was proper, and thus harmless, because the deputies' testimony about the 2015 incident could have shown defendant "had a motive for assaulting the deputies." That may be, but it is also possible that the jury could have found that the evidence hurt the deputies' credibility. Again, this is a credibility issue the jury should have decided.

*Van Arsdall* held that whether a Confrontation Clause violation is harmless "depends upon a host of factors," but identified five specific factors that are "readily accessible to reviewing courts": (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted," and (5) "the overall strength of the prosecution's case." (*Van Arsdall*, *supra*, 475 U.S. at p. 684.)

Here, the deputies' testimony was crucial on counts 2 and 4 since it was effectively the only prosecution evidence for those counts. For that reason, their testimony was not cumulative. And there was no evidence, such as dashcam footage, "decisively corroborat[ing] or contradict[ing]" their account. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1293.) The fourth factor "strongly favors" defendant because the 2015 incident was the only grounds defendant had for showing the deputies' bias against him, and the trial court effectively only allowed him to ask the deputies whether they were biased against him. (See *Reiner v. Woods* (6th Cir. 2020) 955 F.3d 549, 560.) Finally, as to the fifth factor, "[i]n a case that rested almost entirely on credibility . . . we cannot say

21

the overall strength of the prosecution's evidence compelled but one conclusion—[defendant] was guilty [of counts 2 and 4] as charged beyond a reasonable doubt." Again, the prosecution submitted no evidence beyond the deputies' testimony to prove defendant's guilt on those counts. (*Castaneda-Prado*, *supra*, at p. 1293.)

For all of these reasons, we conclude the trial court's ruling restricting defendant's cross-examination of Deputies' Dominguez and Kabluyen violated the Confrontation Clause, and that violation was not harmless beyond a reasonable doubt. We therefore reverse defendant's convictions on counts 2 and 4.

C. Pitchess *Motion*

Before trial, defendant moved for disclosure of the personnel records of Deputies Dominguez and Kabluyen. Specifically, defendant sought any personnel records about the officers' "(1) falsifying police reports or providing false testimony, (2) failure to follow departmental policy, (3) fabrication of charges, (4) false arrest, (5) disciplinary records, and (6) dishonesty and improper tactics no matter how catalogued by the department." Defendant sought these records to support his argument that the deputies' testimony was not credible. The trial court reviewed the records in camera and found no disclosable material.

Although this claim is moot given our reversal of counts 2 and 4, we exercise our discretion to address it for the sake of judicial economy since it may reoccur if defendant is retried on those counts. (See *People v. Calderon* (1991) 232 Cal.App.3d 930, 938; *Monty v. Leis* (2011) 193 Cal.App.4th 1367, 1372.) We have likewise reviewed the

22

records filed under seal in this court, and disagree with the trial court there is no disclosable material.

A defendant is "entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct." (*People v. Gaines* (2009) 46 Cal.4th 172, 179.) "If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed." (*Ibid*.) The trial court must then disclose to the defendant "'such information [that] is relevant to the subject matter involved in the pending litigation.'" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226.) Information is relevant, and thus should be disclosed, if it "will 'facilitate the ascertainment of the facts' at trial [citation], that is, 'all information pertinent to the defense.'" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7 14.) Thus, the trial court's "duty to disclose encompasses information that is not itself admissible but which 'may lead to admissible evidence.'" (*People v. Gaines*, *supra*, at p. 182.) We review the trial court's ruling on a *Pitchess* motion for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.)

In March 2022, a citizen filed a Civilian Complaint (No. P# 2022-0233) against Deputy Dominguez and other sheriff's deputies related to his arrest. The complaint alleged, among other things, that Deputy Dominguez intentionally "failed to document his [the complainant's] injuries in a deputy report" following the complainant's arrest. The Sheriff's department's Internal Affairs Division investigated the complaint and

23

determined it to be "unfounded" because an officer's "audio belt recording confirmed [the complainant] indicated he did not want a Deputy Report taken."

In November 2021, a citizen filed a Civilian Complaint (No. P# 2021-0272) against Deputy Kabluyen and other sheriff's deputies related to the complainant's son's arrest. The complaint alleged, among other things, that Deputy Kabluyen (1) unlawfully arrested the complainant's son, (2) coerced him to provide incriminating statements, and (3) falsified a deputy report. The department's Internal Affairs Division investigated the complaint and found these allegations to be "unfounded."

In our view, these complaints are discoverable because they may lead to admissible evidence to support defendant's challenge to the deputies' credibility. (See (*People v. Gaines*, *supra*, 46 Cal.4th at p. 182; *People v. Zamora* (1980) 28 Cal.3d 88, 101.) As outlined above, the deputies' credibility was a critical issue given that their testimony was effectively the only prosecution evidence for counts 2 and 4. The fact that the complaints were found to be unfounded is immaterial because "unsustained complaints are discoverable." (*People v. Zamora*, *supra*, at p. 93 fn.1.) This is because "the burden for preparing a criminal defendant's case rests with his counsel, not with the police department. That burden cannot be properly discharged unless counsel has direct access to potential witnesses, for it is counsel who must decide if they can aid his client, not the police department's internal affairs division, however sincere and well motivated the latter may be." (*Kelvin L. v. Superior Court* (1976) 62 Cal.App.3d 823, 829.)

On remand, if the People elect to retry defendant on counts 2 and 4, the trial court is directed to order the sheriff's department to disclose to defendant (1) the name, address, and phone number of the complainants who filed Civilian Complaints (No. P# 2022-0233) and (No. P# 2021-0272), (2) the name, address, and phone number of any witnesses to the incident(s) in question, and (3) the dates of the incidents in question. (*People v. Nuno* (2024) 105 Cal.App.5th 1030, 1054.) The trial court must then give defendant a reasonable opportunity to investigate the disclosed material before retrial on counts 2 and 4, if any. If the People do not retry defendant on counts 2 and 4, then the trial court is directed to deny defendant's *Pitchess* motion as moot.

D. *Remaining Issues*

Defendant contends the trial court erred by denying his *Romero*[6] motion to strike one or more of his prior serious felony convictions, his sentence is unconstitutional, and the abstract of judgment is incorrect. Because we reverse his convictions on counts 2 and 4 and remand for further proceedings, these claims of error are moot. (See *People v. Jeter* (2005) 125 Cal.App.4th 1212, 1218; *People v. Hishmeh* (2020) 52 Cal.App.5th 46, 55.)

---

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

25

IV.

DISPOSITION

The judgment is reversed in part and affirmed in part. Defendant's convictions on counts 2 and 4 are reversed, but his convictions on counts 1, 3, and 5 are affirmed. Defendant's sentence is therefore vacated. On remand, if the People do not timely retry defendant on counts 2 and 4, the trial court shall resentence him on counts 1, 3, and 5 accordingly. If the People timely retry defendant on counts 2 and 4, the trial court is directed to disclose the *Pitchess* records consistent with this opinion and afford defendant a reasonable opportunity to investigate the disclosed material before retrial.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

26